AO 106 (Rev. 04/10) Application for a Search Warrant    SEALED    CLERK'S OFFICE U.S. DISTRICT COURT
AT ABINGDON, VA
FILED
MAR 12 2019
JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
for the
Western District of Virginia

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

The residence, curtilage and vehicles and outbuildings
thereon, located at 716 S. Church St., Marion VA 24354

Case No. 1:19mj35

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____Western_____ District of _____Virginia_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21, USC, Section 841 | Distribution of Controlled Substances |
| Title 18, USC, Section 924(c) | Posession of Firearm During and In Relation to Drug Trafficking Crime |

The application is based on these facts:

See Attachment C

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*/s/*
Applicant's signature

Special Agent Peter Gonzalves
*Printed name and title*

Sworn to before me and signed in my presence.

Date: March 12, 2019

City and state: Abingdon, VA

*/s/ Pamela Meade Sargent*
Judge's signature

Honorable Magistrate Judge Pamela Meade Sargent
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF VIRGINIA

Abingdon Division

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR A SEARCH WARRANT FOR THE RESIDENCE LOCATED AT 716 S. CHURCH ST., MARION, VIRGINIA 24354 | **UNDER SEAL**<br><br>1:19-sw- |

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Peter Gonzalves, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for the residence located at 716 S. Church St, Marion, VA. An ongoing investigation has indicated there is probable cause to show evidence of violations of Title 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 924(c) is concealed in this residence.

2. I am a Special Agent with the Bureau of Alcohol Tobacco Firearms and Explosives ("ATF") and have been so employed since August 2016. I am currently assigned to the Bristol, Virginia Field Office. Prior to becoming an ATF Special Agent, I was a Special Agent with the US Department of State, Diplomatic Security Service for approximately six years. I have taken part in numerous federal, state, and local investigations concerning document and identity fraud, financial fraud, cyber crimes, and firearms and narcotics violations.

3. I am an investigative law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 United States Code, and am empowered by law to conduct investigations and to make arrests for the offenses enumerated in Section 2516 of Title 18 United States Code.

4. Through instruction and participation in investigations, I have become familiar with the manner and methods by which narcotic traffickers conduct their illegal business and the language and terms that are used to disguise conversations about their narcotics activities. From experience and training, I have learned, among other things, that in conversations narcotics traffickers believe susceptible to interception, they virtually never expressly refer to methamphetamine or other illegal drugs by name; instead to conceal the true nature of their illegal activities and to thwart detection by law enforcement, they refer to the drugs and drug quantities using seemingly innocent terms. Further, based upon my knowledge, training, experience and participation in narcotic trafficking investigations, I know that: Individuals who deal in illegal controlled substances maintain books, records, receipts, notes, ledgers, bank records, money orders, electronic files/data, computers and papers relating to the importation, manufacture, transportation, ordering, sale and distribution of illegal controlled substances. These books, records, receipts, notes, ledgers, bank records, money orders, electronic files, computers, mobile devices etc., are maintained in locations to which the dealers in illegal controlled substances have ready access, such as within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities, such as stash houses or safe houses; in business

locations with which the trafficker is associated; in storage areas; or maintained electronically on local devices or stored in internet based server systems.

5. Based on my training and experience I have become familiar with methods used by traffickers to smuggle and safeguard narcotics, to distribute narcotics, and to collect and launder proceeds. I am aware of the sophisticated tactics they routinely use to attempt to thwart detection by law enforcement, which include the utilization of numerous different cellular telephones, counter surveillance, elaborately planned distribution schemes, false or fictitious identities, and coded communications and conversations.

6. I am also aware individuals who distribute narcotics often keep firearms close at hand to protect the products they offer for sale and the proceeds of those illicit sales. As firearms are durable goods, these individuals often store firearms on their persons, in their residences, or in their vehicles and other mobile conveyances for extended periods of time.

7. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement officers and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

8. Based on my training and experience and the facts, as set forth in this affidavit, there is probable cause to believe that J'Tavious WILLIAMS has committed violations of Title 21 U.S.C. § 841(a)(1), and 18 U.S.C. § 924(c). There is also probable cause to search the location described in Attachment A for evidence, contraband or fruits of these crimes, as described in Attachment B.

## PROBABLE CAUSE

9. On February 1, 2018, officers with the Marion, VA Police Department (MPD) responded to a report of shots fired in the area of 557 South Church St, Marion, VA. Responding officers were able to locate little in the way of witness information, but recovered several 9mm shell casings from the driveway at 557 S. Church St. 911 callers were unable to give a good description of the shooter or the vehicle he/she left in, but stated the shooter came from the upstairs apartment. At the time of the incident, WILLIAMS resided in the upstairs apartment at that location.

10. On February 8, 2018, MPD Officer Yonts conducted a traffic stop of a vehicle in the town of Marion, VA. As a result of the investigation stemming from that stop, Officer Yonts seized a Taurus PT111 Millennium G2 9mm semiautomatic pistol, S/N TKN91612. The individual who possessed that pistol is a known associate of WILLIAMS (the Associate).

11. On February 20, 2018, a concerned citizen showed MPD Officer Yonts a video posted by WILLIAMS to his Snapchat account. The video depicted WILLIAMS with suspected marijuana, large amounts of US currency, and what appeared to be a Glock handgun with an extended magazine. On February 21, 2018, Officer Yonts obtained a state search warrant for WILLIAMS' residence, located at 557 South Church St, Marion, VA. Deputies with the Smyth County Sheriff's Office (SCSO) and ATF SA Gonzalves assisted MPD officers with executing the warrant. Officers recovered suspected marijuana, US currency, scales, plastic bags, several cell phones, and a Taurus revolver from the apartment. Officers also recovered a Taurus 9mm semiautomatic pistol magazine, which was stamped with "PT111." This magazine was located in a suitcase in

WILLIAMS' bedroom. WILLIAMS was not present in the apartment when officers arrived to execute the warrant. MPD officers later located WILLIAMS a short distance from the apartment and took him into custody based on evidence located during the search.

12. After completing the search at the residence, MPD officers transported WILLIAMS to SCSO for processing and an interview. Officer Yonts and I conducted the interview, which was audio and video recorded. At approximately 5:36 PM, Officer Yonts advised WILLIAMS of his Miranda rights. WILLIAMS then agreed to speak with investigators.

13. Officer Yonts began the interview by outlining the evidence located in WILLIAMS' apartment and the charges he could be facing as a result. At that time, WILLIAMS stated he did not wish to comment on the drugs and other evidence found in the apartment. When asked about the shooting that took place outside his apartment a few weeks prior, WILLIAMS denied any involvement and stated he was at his girlfriend's house at Marion Manor at the time. WILLIAMS further stated he knew little about it, and heard about it from his mother upon his return to his residence. Officer Yonts asked WILLIAMS about the handgun located during the search. WILLIAMS indicated he had it for protection, and had never fired it before. SA Gonzalves asked WILLIAMS if he had any other firearms in his possession, which he denied. He also denied having any other firearms recently. WILLIAMS further stated he sells drugs, so anybody could come to his residence to try and rob him. WILLIAMS would not reveal who he purchased the firearm from, but did state he paid approximately $300 cash. WILLIAMS then stated he purchased it in Bristol, TN

approximately 1.5-2 months ago, but declined to provide the name of the person he bought it from. SA Gonzalves asked WILLIAMS about the Taurus 9mm magazine located in the apartment during the search. WILLIAMS stated he had a Taurus 9mm pistol, but recently sold it for approximately $250. WILLIAMS declined to state who he sold it to, and could only describe it as small, black and "carried well." SA Gonzalves told WILLIAMS about the 9mm shell casings recovered from the driveway of his apartment and the bullet holes in houses in the neighborhood, and WILLIAMS responded by saying he wasn't the one doing the shooting. Officer Yonts asked WILLIAMS if the person he sold the Taurus to is a felon, and WILLIAMS stated he is certain they are not. WILLIAMS further stated he just saw the guns and drugs as money, nothing more. SA Gonzalves asked WILLIAMS if he sold anything other than marijuana, which WILLIAMS denied. WILLIAMS stated he just received about 2 ounces of marijuana "a couple days" ago.

14. When asked about a Glock with an extended magazine, WILLIAMS began to fidget in his chair and denied having one. WILLIAMS also refused to discuss the current location of the Glock officers were referring to or who may have possession of it. WILLIAMS went on to state someone tried to sell it to him, but he didn't want it and chose not to buy it. SA Gonzalves began explaining what charges WILLIAMS could potentially be facing, and WILLIAMS interrupted stating he fired the shots that left the shell casings recovered in the driveway after the shooting on February 1, 2018. WILLIAMS further stated somebody went to his house and robbed him of an ounce of marijuana. WILLIAMS was in his apartment with friends playing video games when an individual showed up and asked to buy an ounce of marijuana. That

individual told WILLIAMS the money was in the car, and he'd be right back with it. WILLIAMS further stated the individual was gone a long time, and he told his mom he'd start shooting if the person robbed him. At that point, someone at the apartment told him the brake lights came on in the vehicle, and WILLIAMS stated he then ran downstairs and started shooting at the vehicle. WILLIAMS clarified two individuals came into the apartment from the car. He also stated he knew the individuals, and believed he could trust them. WILLIAMS then stated he had the Taurus 9mm pistol zipped up in his jacket pocket, and started shooting it at the car as soon as he reached the bottom of the stairs. WILLIAMS further stated he didn't even see what kind of car it was because it was dark out. Officer Yonts informed WILLIAMS that officers located 2 different types of shell casings in the driveway after the shooting. WILLIAMS stated he wasn't aware of anyone else firing shots during that incident. When asked to describe the rounds loaded in the gun, WILLIAMS stated the casings were silver and he believed the bullets were hollow points. WILLIAMS also remarked there were 4 cartridges left in the Taurus 9mm pistol when he sold it to his friend. WILLIAMS clarified the vehicle he was shooting at was silver, but he didn't know what kind of car it was. WILLIAMS also stated he knew the two individuals who came into the apartment, but wouldn't say who they were.

15. While discussing the revolver officers located in WILLIAMS' bedroom, WILLIAMS stated he had recently been robbed and had that revolver for protection. WILLIAMS then agreed shooting at a vehicle leaving his residence would not classify as self defense. WILLIAMS would not give up a name as to who brought the Glock to his house, but stated the individual drives a white Chevy Tahoe. The individual is from

Bristol, and WILLIAMS met him at a party. WILLIAMS described him as a white male with a couple tattoos and brown hair with a buzz cut. His stature is 5'10"-6'1" and about 240 pounds. WILLIAMS denied having any contact information from this individual. WILLIAMS also stated he bought the Taurus revolver from this individual.

16. When asked about his marijuana supplier, WILLIAMS stated he goes to Bristol, TN to pick up. He further stated he has a couple of suppliers, and meets them around town. He wouldn't elaborate as to who he buys from, where he meets them, or who drives him. WILLIAMS further stated he sells drugs, and the items located in the apartment came from his bedroom.

17. After completing the interview, Officer Yonts brought the marijuana recovered from the apartment and conducted a field test. The sample field tested positive for marijuana. Officer Yonts explained the charges WILLIAMS would be facing at that time. WILLIAMS went on to state he sold the Taurus pistol from the shooting to his friend (whom law enforcement believe is the previously mentioned Associate) because it was "too hot." He also mentioned the cash from his bedroom was approximately $5000.

18. On April 6, 2018, MPD Lt. Hamm obtained and executed a state search warrant to recover projectiles from Victim 1's vehicle. Lt. Hamm was able to recover projectiles and projectile fragments from the vehicle. While Lt. Hamm was searching Victim 1's vehicle, SA Gonzalves interviewed Victim 1. At the time of the shooting, Victim 1 was reclined and asleep in the front passenger seat of the silver Dodge Magnum. Victim 1 further stated Victim 2 was driving and Victim 3 was in the back seat. Victim 1 awoke to the sound of gunshots as the car was pulling out of the driveway of 557 S. Church St,

Marion VA. Victim 1 reported hearing approximately 5-6 gunshots. Victim 1 stated Victim 3 had about half a sandwich bag of marijuana. Victim 1 denied witnessing anyone in the car with a weapon or firing any shots. Victim 1 stayed down in the car and wasn't able to see who was shooting or where the shots were coming from. Victim 1 believed the car made a right turn out of the driveway of the 557 S. Church St. location. Victim 1 also believed Victim 3 had stolen some marijuana from WILLIAMS. Victim 1 reported waking only when a bullet struck the passenger side door. When asked why they were at that location, Victim 1 stated the only reason was to give Victim 3 a ride there.

19. On November 30, 2018, MPD Officer Yonts provided SA Gonzalves with copies of reports from the Virginia Department of Forensic Science in reference to the Taurus 9mm pistol believed to be used in the 557 S. Church St. shooting. In summary, the reports show the majority of casings collected from the scene and projectiles later recovered from Victim 1's vehicle match the Taurus PT111 Millennium G2 9mm Pistol, S/N TKN91612 that MPD recovered from WILLIAMS' associate.

20. On November 30, 2018, Officer Yonts browsed public content on WILLIAMS' Facebook page. Officer Yonts located a "Facebook Live" video on the page from October of 2018. Officer Yonts observed WILLIAMS appearing to video himself riding in the back seat of a vehicle having a conversation with an individual in the front of the vehicle. At one point, an individual in the front seat asks WILLIAMS to sell her marijuana. WILLIAMS agreed, and they proceed to WILLIAMS' residence. Officer Yonts recognized the residence in the video as 716 S. Church St, Marion VA. WILLIAMS appears to use a key to open the front door of the house. Upon entering the

residence, WILLIAMS continued narrating the video and stated "I'm at the crib." Based on my training and experience, I know the term "crib" is a euphemism for a person's home. WILLIAMS moves to what appears to be the living room couch. He then points the camera at the couch, where an AK-47 style semiautomatic rifle is displayed prominently next to what appears to be a box of ammunition. While continuing to narrate, WILLIAMS retrieved what appears to be marijuana from a plastic bag. He also stated he upgraded from a pistol to a "K," which I believe to be in reference to the AK-47 shown earlier in the video. Moments later, WILLIAMS walked back outside the residence and got back into the vehicle he was previously riding in. Once WILLIAMS got back into the vehicle, someone in the front seat made a remark about the vehicle now smelling like "weed." At that point, WILLIAMS told the front seat occupants not to use the word "weed" on his Facebook Live.

21. On November 30, 2018, I sent a preservation request to Facebook, Inc. in order to preserve the contents of the Facebook user account J'Tavious WILLIAMS, with Facebook ID jtavious.williams for a period of 90 days.

22. On January 23, 2019, a Witness stated he/she had "recently" seen WILLIAMS with what was described as a "big gun." The Witness was unable to confirm it was an AK-47 style rifle, as he/she professed a very limited knowledge of firearms, however the Witness seemed to think it could be an AK-47. The Witness further stated WILLIAMS procured the firearm "a few months ago." The Witness also stated he/she saw the firearm in WILLIAMS' residence, and he keeps it in a safe located in his bedroom.

23. On or about January 25, 2019, SA Gonzalves went to Highland Arms in Abingdon VA. Highland Arms is a licensed firearms dealer, and accordingly holds a Federal Firearms

License (FFL). As part of its regulatory authority, ATF has the authority to retrieve records from any FFL upon request of ATF personnel. SA Gonzalves obtained copies of firearm purchase forms, including an ATF Form 4473 (Firearm Transaction Record), documenting WILLIAMS' purchase of a Century Arms C39V2 AK-47 style semiautomatic rifle on October 13, 2018. According to the documents, WILLIAMS presented his Virginia Department of Motor Vehicles (DMV) issued driver's license (DL). SA Gonzalves performed a query of the DMV database, and the DL number listed on the form is assigned to WILLIAMS. Additionally, the rifle shown in WILLIAMS' Facebook Live video is consistent with advertisement photographs displayed on the Century Arms public website of their model C39V2 rifle.

24. On February 12, 2019, SA Gonzalves and Officer Yonts interviewed WILLIAMS' Associate. As discussed above, the Associate is the individual who Officer Yonts recovered the Taurus PT111 9mm pistol WILLIAMS admitted to using in the shooting on February 1, 2018. The Associate stated he/she was at WILLIAMS' residence the night of the shooting. The Associate reported witnessing Victim 3 enter the apartment and ask WILLIAMS for marijuana. The Associate further stated Victim 3 told WILLIAMS he would bring money back up from the car outside to pay for the marijuana. The Associate stated WILLIAMS then watched Victim 3 from the main entry door of the apartment, and run outside when Victim 3's vehicle started moving. The Associate then heard several gunshots, and ran to the apartment door to investigate. The Associate reported subsequently hearing WILLIAMS make several statements to the effect of "I need to get out of here," "I shot at the car," and "He tried to run off with my stuff."

25. On March 4, 2018, I received the production of information from Facebook in response to a federal search warrant. Among other items, the return includes private Facebook messenger content. Based on my training and experience, and prior statements made my WILLIAMS, I interpret the content of the following conversations to be related to distribution of narcotics.

26. WILLIAMS had the following conversation via Facebook Messenger with Customer 1 on February 5, 2019:

    a. Customer: How much for a onion

    b. WILLIAMS: 2

    c. Customer: I want it

    d. Customer: Where can I meet u at

    e. WILLIAMS: I'll lyk when I get to the crib

    f. Customer: Ight

    g. Customer: I'm in town now if I go back home I won't be out until around 9:30-10

    h. WILLIAMS: I'm home now

    i. Customer: Ight I jus got home 😊 let me put my kids to bed I will be over

    j. WILLIAMS: Got thst gas waiting for ya (Based on my training and experience, and on previous social media posts made by WILLIAMS, I know "gas" is a euphemism for marijuana)

    k. Customer: On my way!

27. WILLIAMS had the following conversation via Facebook Messenger with Customer 2 on February 10-11, 2019:

    a. WILLIAMS: Need any

- b. Customer: Price on oz
- c. WILLIAMS: 225
- d. Customer: Give me a min ill let u know
- e. Customer: Ill grab that in like 30mins
- f. Customer: Otw

28. WILLIAMS had the following conversation via Facebook Messenger with Customer 3 on February 12, 2019:
    - a. Customer: Yo
    - b. Customer: I need 50 gs
    - c. WILLIAMS: U meant 50 bucks worth
    - d. Customer: How much would that be and nah 50 gs
    - e. WILLIAMS: How much u tryna spend
    - f. Customer: Ion know fr this isn't for me
    - g. Customer: I'm tryna see how much you gon charge me
    - h. WILLIAMS: Ask them how much they tryna spend and how much they got

29. On February 12, 2019, SA Gonzalves and Officer Yonts interviewed WILLIAMS' Associate. As discussed above, the Associate is the individual from whom Officer Yonts recovered the Taurus PT111 9mm pistol WILLIAMS admitted to using in the shooting on February 1, 2018. The Associate stated he/she was at WILLIAMS' residence the night of the shooting. The Associate reported witnessing Victim 3 enter the apartment and ask WILLIAMS for marijuana. The Associate further stated Victim 3 told WILLIAMS he would bring money back up from the car outside to pay for the marijuana. The Associate stated WILLIAMS watched Victim 3 from the main entry door

of the apartment, and ran outside when Victim 3's vehicle started moving. The Associate then heard several gunshots, and went to the apartment door to investigate. The Associate reported subsequently hearing WILLIAMS make several statements to the effect of "I need to get out of here," "I shot at the car," and "He tried to run off with my stuff."

## CONCLUSION

30. Based on the forgoing, I request that the Court issue the proposed search warrant for the residence, outbuildings, and any vehicles on the curtilage located at 716 S. Church St., Marion, VA, which is in Smyth County, which is in the Western Judicial District of Virginia.

## REQUEST FOR SEALING

31. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

_____
Special Agent Peter Gonzalves
Bureau of Alcohol, Tobacco, Firearms, and Explosives
United States Department of Justice


Subscribed and sworn to before me on March 12, 2019

_____
HONORABLE JUDGE PAMELA MEADE SARGENT
UNITED STATES MAGISTRATE JUDGE IN THE
WESTERN DISTRICT OF VIRGINIA

# ATTACHMENT A

## DESCRIPTION OF PLACES TO BE SEARCHED

**THE PREMISES:**

A white, one-story residence with a shingle roof. There is a gravel driveway and a wood fence to the right of the residence, and a wood fence between the front yard and the street. The number "716" appears above the front door of the house, and there is an unattached garage behind the house.

**VEHICLES/CURTILAGE**

Any and all vehicles and outbuilding(s) on the property.

**LOCATION OF THE PREMISIES:**

Residence is located at 716 S. Church St, Marion VA



# ATTACHMENT B

## List of items to be searched for and seized at premise

1. Firearms, firearm magazines, firearm attachments, ammunition, firearm parts and holsters; documentation of the purchase, storage, possession, disposition, dominion and control of firearms, including paperwork and receipts.

2. Scales, plastic bags, large amounts of US currency, and any other articles commonly associated with distribution of narcotics.

3. Books, records, receipts, notes, ledgers, letters, and other papers relating to the transportation, ordering, purchase and trafficking of firearms or narcotics.

4. Address and telephone books and papers reflecting names, address and telephone numbers.

5. Electronic equipment, such as mobile telephones, computers, electronic data storage media, currency counting machines, electronic media storage devices, surveillance camera storage devices, and any information stored in memory or contained in any related hardware and software.

6. Photographs, in particular, photographs of individuals with firearms and other documents identifying associates and conspirators.

7. Indicia of occupancy, residence, and ownership of the premise, including but not limited to, utility and telephone bills, canceled envelopes, and keys.

8. Any locked or closed container(s) believed to contain any of the above listed evidence.